848 A.2d 853 (2004)
369 N.J. Super. 279
STATE of New Jersey, Plaintiff-Respondent,
v.
Lesnik HOMDZIUK, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Submitted March 8, 2004.
Decided May 19, 2004.
*854 Yvonne Smith Segars, Public Defender, attorney for appellant (Patricia Nichols, Designated Counsel, of counsel and on the brief).
James F. Avigliano, Passaic County Prosecutor, attorney for respondent (Jane E. Hendry, Senior Assistant Prosecutor, of counsel and on the brief).
Before Judges COLLESTER, FUENTES and BILDER.
The opinion of the court was delivered by COLLESTER, J.A.D.
Tried to a jury, defendant Lesnik Homdziuk was convicted of second-degree manslaughter, contrary to N.J.S.A. 2C:11-4b, third-degree terroristic threats, contrary to N.J.S.A. 2C:12-3a and 2C:12-3b, second-degree tampering with a witness, contrary to N.J.S.A. 2C:28-5a, and third-degree hindering apprehension, contrary to N.J.S.A. 2C:39-3b(2). On February 22, 2000, Judge Randolph M. Subryan sentenced defendant to a presumptive term of seven years on the manslaughter convictions, subject to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2. He then merged the convictions of terroristic threats and hindering apprehension with the second-degree tampering with a witness conviction and imposed a consecutive sentence of five years. Therefore, the aggregate sentence imposed was twelve years with seven, nine months and six days to be served under NERA.
On the afternoon of July 11, 1999, the Clifton Police Department received a report *855 of a body near the Passaic River in a wooded area adjacent to Randolph and VanRiper Avenues. The responding patrol officers located the body in a clearing surrounded by thick underbrush and a canopy of trees. Clifton Detectives James Scartozzi and Nick Donato were assigned to the investigation. Detective Scartozzi knew the area was used as a resting place by vagrants. Several makeshift beds were in the area along with bags of clothing hanging from tree limbs. Led to the scene by patrol officers, the detectives found the supine body of a man dressed in green pants and a t-shirt. A thick green fleece blanket covered most of the body. Over the face was a green floral pattern pillow case. The body was lying on a piece of cardboard which had been converted to a makeshift bed with a sofa cushion used as a pillow. No blood was observed on the victim's clothing.
The patrol officer introduced the detectives to Mikolaj Szakalis, who told them he had found the body and notified the police. Because Szakalis spoke broken English, the detectives summoned a Polish-speaking police officer to assist in their interview. Szakalis related that the dead man was a fellow vagrant who lived in the area. He thought his name was Jan or Jon and did not know his surname. He said that he last saw the victim the prior day at a liquor store and discovered the body in the morning when he was looking for an area to fish. During the interview, Detective Scartozzi noticed that Szakalis had bruises on his face that were healing. When asked, Szakalis said he had been in a fight with another vagrant a couple of days earlier. He also said he did not witness any fight involving Jan, but then added he thought that defendant may have inflicted injuries to him.
Soon afterwards the victim was positively identified as Jan Wszeborowski. The police investigation soon disclosed that both Szakalis and the victim were among a number of homeless people who frequently gathered at the bank of the Passaic River in the Botany Village section of Clifton in an area they called "Headquarters." Other persons who frequented Headquarters included the defendant and co-defendant, Marek Z. Malinowski.
The autopsy was performed the following day by Dr. Geetha A. Nataragon, a forensic pathologist with the Passaic County Medical Examiner's Office. She observed bruising and other visual injuries to the victim's face, head, upper chest and back. The most significant external injuries were to the left side of the victim's face. There was bruising and swelling over the left upper facial area. Over the left upper jaw bone or cheek bone area was a prominent one inch diameter bruise, and the surrounding tissue was swollen with a bluish, purple color. There was blood within the white area of the left eye and bleeding on the left side of the naso labial fold. Dr. Nataragon opined that all of the facial injuries were of the same age and were caused by blunt force trauma to the face and head. Her internal examination disclosed no skull fractures, but there was hemorrhaging in the brain and acute cerebral edema. Other areas also showed evidence of the application of blunt force to the victim. His chest and back were bruised, and the internal examination revealed hemorrhaging in superficial layers of the skin in that area. Dr. Nataragon later opined that the injuries were consistent with the decedent being struck while supine on a hard surface. The internal findings disclosed that the victim's liver suffered significant damage due to years of alcohol abuse. The extent of liver damage was such that there was a deficient clotting mechanism so that blood clots did not form sufficiently to prevent the victim's brain injury and death. Moreover, the extent of *856 alcohol abuse contributed to a thinned skull bone, which made the victim more susceptible to brain injuries. Notably, at the time the autopsy was performed, two days after death, the victim had a high blood alcohol reading of .259. Dr. Nataragon's conclusion was that the cause of death was blunt force trauma to the face resulting in acute subdural hematoma and cerebral contusions.
Clifton detectives returned to Headquarters on July 13, 1999, and interviewed those at the scene. Defendant's name along with that of Marek Z. Malinowski were mentioned. Later that day police located them in Passaic, and both agreed to meet with Detective Donato at the Clifton Police Department. When the men arrived, Donato explained to them that a translator was on the way. However, he said both men were very insistent on speaking "right then and there." Donato then told them separately that he was trying to get information about the death of their friend, Jan.
Defendant told Donato he wanted to clear his name and said he met Malinowski on July 10 between 11:00 a.m. and noon under the Ackerman Avenue bridge in Clifton where they began drinking vodka. That afternoon between 4:00 and 5:00 p.m. they went to Headquarters. They met Stefan Radecki and Mikolaj Szakalis and continued drinking. Shortly thereafter, the victim joined the group. Defendant said that the victim had fresh bruises on the left side of his face caused by a brief fight with Szakalis over vodka. Defendant said he attempted to clean off the victim's bloodied face and for this reason some of the victim's blood may have smeared on the shorts he was wearing.
The defendant admitted after the victim accused him of stealing a radio, he slapped the victim with his open left hand twice on the right side of the face. He denied that he caused any injury to the victim during the altercation. He said he left the area with Malinowski soon afterwards, visited go-go bars until 2:00 a.m. and smoked cigarettes outside Malinowski's home until 3:00 a.m. He then went to his girlfriend's apartment and passed out. He said the last time he saw the victim was when he left Headquarters in the afternoon, at which time the victim was drinking with Stefan Radecki and Szakalis. He said he learned of the victim's death the following morning.
During his interview with the police, Malinowski essentially corroborated defendant's statement, but did not indicate he witnessed any kind of altercation between the defendant and the victim. He added that just before leaving, he and the defendant helped the then alive victim move to a spot near the river so that he could rest.
When Stefan Radecki was interviewed, he said that he and defendant moved the victim's mattress from the area where the victim usually slept to Headquarters where the men gathered to drink. He said the victim had facial injuries which the men cleaned with vodka. Later the victim complained of pain and walked to a different area to lie down for the night.
The police also interviewed Janina Kochan, who stated she went to Headquarters on July 10, 1999. As she approached, she heard screaming and saw Malinowski holding the victim's legs waist-high while defendant kicked him in the chest. She said that defendant was wearing steel-tipped cowboy boots, long pants, a black belt with metal studs and a leather string tie. She said she was unable to stop the beating and ran away in fear. She added that defendant threatened her on several occasions not to tell anyone what she had seen that night.
*857 After interviewing these witnesses, the detectives decided to speak again with Szakalis. This time he told them that he observed the victim with bruises on his face at about 4:00 p.m. on July 10, 1999, which appeared to be the same as those he observed when he found the body the following day. He said that all the men at Headquarters had been drinking during the day, but none were "falling down drunk." He stated that the victim was lying down on some plastic until Malinowski pulled the victim by his leg off of the plastic onto the ground. He then saw the defendant kick the victim three times in the stomach while the victim was lying face down on the ground and screaming. He said that after the beating the victim drank more vodka, laid down and got up to walk to his sleeping area. Szakalis said he did not see the victim again until the following morning.
On July 16, 1999, defendant and Malinowski were arrested and transported to the Clifton Police Department. With the assistance of a Polish interpreter, they were separately advised of the charges against them and given their Miranda[1] warnings. The defendant waived his rights and gave a written statement encapsulating the same factual version he gave police earlier. At the time of his arrest defendant was wearing a black leather belt with metal studs.
After obtaining a search warrant, the detectives went to the apartment defendant shared with Kinga Goclawska. She cooperated with the police in execution of the warrant, giving them defendant's clothing. She said she was with the defendant on July 11, 1999, when he learned of the victim's death. She said he became visibly upset. Goclawska then called her mother to come to the residence. Both women told the detectives that defendant was crying and said that if he had known the victim could have died, he would not have hit him or kicked him. Goclawska said defendant later admitted to her that he and Malinowski fabricated the statements they gave to the police.
While at the apartment, the detectives noticed several garbage bags with clothing piled on top outside the exterior doorway. Goclawska explained that the clothing, consisting of a pair of denim shorts and a white tank top, were worn by the defendant on the night of the victim's death and that he put them outside the residence to be taken out with the regular garbage. She said that to her knowledge defendant did not own cowboy boots and that he was wearing sneakers when she saw him on the night of July 10, 1999. No metal-tipped cowboy boots were ever recovered.
The clothing, DNA samples taken from defendant and co-defendant, and a control sample of the victim's blood were submitted to the New Jersey State Police laboratory. The results of the examination included a finding that a blood stain on defendant's denim shorts matched the blood of the victim.
Defendant testified at trial that on the night of July 10, 1999, he arrived at Headquarters and confronted the victim "because he was suspecting me of stealing his radio." Defendant said that the victim was intoxicated and that an argument developed between the two men. Defendant said he struck the victim twice on the cheek, knocking him down, but the victim got up right away. He said he never saw Janina Kochan that night and denied threatening her at any time. He also denied that he attempted to dispose of his clothing or shoes or that he had rehearsed a story with Malinowski to tell police. He *858 said he never owned or wore cowboy boots. He explained that the victim's blood on his shorts by saying he wiped the blood off the victim's left cheek and ear with a cloth and that he may have smeared some blood on his shorts.
Following his conviction and sentence, defendant appealed. He submits through counsel the following arguments for our consideration:

POINT ITHE MEDICAL EXAMINER'S OPINION AS TO MANNER OF DEATH WAS IMPROPER, AS IT HAD NO FOUNDATION; THE EXPERT PROVIDED NO QUALIFICATIONS TO REACH SUCH A CONCLUSION; GAVE EXPERT WEIGHT TO THE STATE'S THEORY OF THE CASE AND DETERMINED AN ULTIMATE ISSUE THAT SHOULD HAVE BEEN DECIDED BY THE JURY. (Not Raised Below).

POINT IITHE STATE FAILED TO PRESENT A PRIMA FACIE CASE ON ANY OF THE CHARGES IN THE INDICTMENT AND TRIAL COUNSEL WAS INEFFECTIVE FOR ERRONEOUSLY INTRODUCING TO THE JURY PORTIONS OF JANINA KOCHAN'S STATEMENT ALLEGING DEFENDANT KICKED MR. WSZEBOROWSKI IN THE HEAD, CAUSING THE INJURIES WHICH ULTIMATELY CAUSED HIS DEATH AND FAILING TO MOVE FOR DISMISSAL AT THE END OF THE STATE'S CASE OR FOR JUDGMENT OF ACQUITTAL AT THE END OF THE CASE AS THE STATE FAILED TO MEET ITS BURDEN OF PROOF. (Not Raised Below).

POINT IIITRIAL COUNSEL WAS INEFFECTIVE AND THE TRIAL COURT ERRED IN THE DISPOSITION OF DEFENDANT'S MOTION WITH REGARD TO THE VIOLATION OF THE VIENNA CONVENTION ON CONSULAR RELATIONS. (Partially Raised Below).

POINT IVINFERENCE AS TO HOW CERTAIN BLOOD CAME TO BE ON DEFENDANT'S SHORTS WAS IMPROPER AS IT WAS NOT PROPERLY PRESENTED THROUGH EXPERT TESTIMONY, WAS NOT A SCIENTIFIC AREA AT THE STATE OF THE ART THAT EXPERT QUALIFICATION EXISTED ON WHICH AN EXPERT COULD RELY TO BASE SUCH AN OPINION AND WAS IRRELEVANT. (Not Raised Below).

POINT VTHE IMPOSITION OF CONSECUTIVE SENTENCES WHILE AT THE SAME TIME DEFENDANT FACES DEPORTATION FOLLOWING SERVICE OF THAT PERIOD OF INCARCERATION REQUIRED BY THE NO EARLY RELEASE ACT IS CRUEL AND UNUSUAL PUNISHMENT (U.S. CONST. AMEND. VIII; N.J. CONST. ART. I, PAR. 12). (Not Raised Below).
After careful review of the record, we find that the arguments presented by defendant are without sufficient merit for extensive discussion in a written opinion. R. 2:11-3(e)(2). We make only the following comments.
Since defendant's claims of ineffective assistance of trial counsel for the most part involve allegations and evidence which lie outside the trial record, they are more properly raised upon an application for post-conviction relief before the trial court. State v. Preciose, 129 N.J. 451, 460-61, 609 A.2d 1280 (1992); State v. Shabazz, 263 N.J.Super. 246, 250-51, 622 A.2d 914 (App.Div.), certif. denied, 133 N.J. 444, 627 A.2d 1149 (1993); R. 3:22-1 to 22-11. The bulk of the defendant's arguments regarding counsel's performance *859 lie outside the record, and we decline to comment, leaving to defendant his right to pursue the matter on post-conviction relief. However, it is appropriate for us to consider defendant's argument as to the claim of ineffective assistance of counsel with regard to the alleged violation of the Vienna Convention on Consular Relations (VCCR), 21 U.S.T. 71 (1963), since the record discloses the evidence necessary to decide the issue. State v. Moore, 273 N.J.Super. 118, 127, 641 A.2d 268 (App. Div.1994).
Prior to trial defendant unsuccessfully moved to suppress his post-arrest written statement to police, claiming a violation of Article 36 of the VCCR. On appeal he argues that the trial judge erred in denying this motion and that his counsel rendered ineffective assistance in presenting the matter.
Defendant is a citizen of Germany. Both Germany and the United States were signatories to the VCCR, which was ratified by Congress in 1969. The VCCR is a seventy-nine article, multi-lateral treaty governing the establishment of consular relations between signatory nations and defines the functions of a consulate. United States v. Emuegbunam, 268 F.3d 377, 388 (6th Cir.2001), cert. denied, 535 U.S. 977, 122 S.Ct. 1450, 152 L.Ed.2d 392 (2002). Defendant asserts the applicability of Article 36 of the treaty, which protects non-consular individuals and states the following:
[I]f [the foreign national] requests, the competent authorities of the receiving State shall, without delay, inform the consular post of the sending State if, within its consular district, a national of that State is arrested or committed to prison or custody pending trial or is detained in any other manner. Any communication addressed to the consular post by the person arrested, in prison, custody or detention shall also be forwarded by the said authorities without delay. The said authorities shall inform the person concerned without delay of his rights under this sub-paragraph.
See, State v. Jang, 359 N.J.Super. 85, 92, 819 A.2d 9 (App.Div.2003).
It is undisputed that at no time prior to his written statement was defendant advised of the VCCR, and no notification was given to the Germany Embassy that defendant was in police custody as part of an ongoing homicide investigation. At the time of his arrest defendant had been in the United States for about six months. He spoke little or no English. After his arrest, he was advised of his Miranda rights in his native language. He does not claim that he did not receive or understand the Miranda warnings. Rather, he argues for the application of the exclusionary rule to his post-arrest statements and the suppression of evidence obtained by execution of the search warrant because of the failure of police either to notify the German Consulate or advise him of his right to do so. He argues further that "telling a foreign defendant, at time of arrest, that he has a right not to speak, when his own culture may make this right inconceivable, is tantamount to providing a foreign defendant no rights under Miranda at all."
We have previously declined to hold that the VCCR creates a private enforceable right. State v. Cevallos-Bermeo, 333 N.J.Super. 181, 185-87, 754 A.2d 1224 (App.Div.), certif. denied, 165 N.J. 607, 762 A.2d 221 (2000); Jang, supra, 359 N.J.Super. at 94, 819 A.2d 9. In this case, we hold that the exclusionary rule is inapplicable as a remedy for violation of Article 36 of the VCCR.
Ratified treaties between the United States and other independent nations *860 are treated on an equal footing with Federal statutes. Whitney v. Robertson, 124 U.S. 190, 194, 8 S.Ct. 456, 458, 31 L.Ed. 386, 388 (1888); United States v. Zabaneh, 837 F.2d 1249, 1251 (5th Cir. 1988). There is no exclusionary rule generally applicable to international law violations, and therefore, the exclusionary rule is only available as a remedy if the Constitution or a Federal statute requires it. See, United States v. Chaparro-Alcantara, 226 F.3d 616, 621 (7th Cir.) cert. denied, 531 U.S. 1026, 121 S.Ct. 599, 148 L.Ed.2d 513 (2000); United States v. Jimenez-Nava, 243 F.3d 192 (5th Cir.), cert. denied, 533 U.S. 962, 121 S.Ct. 2620, 150 L.Ed.2d 773 (2001). Moreover, the overwhelming weight of authority is that violation of Article 36 of the VCCR does not result in application of the exclusionary rule. See, e.g., United States v. Li, 206 F.3d 56 (1st Cir.) (en banc), cert. denied, 531 U.S. 956, 121 S.Ct. 378, 148 L.Ed. 2d 292 (2000); Waldron v. INS, 17 F.3d 511, 518 (2d Cir.1993), cert. denied, 513 U.S. 1014, 115 S.Ct. 572, 130 L.Ed.2d 489 (1994).
Defendant relies upon State v. Reyes, 740 A.2d 7 (Del.Super.1999), in which the court granted a motion to suppress a foreign national's custodial statement to the police on grounds that violation of Article 36 of the VCCR precluded an intelligent waiver of Miranda rights. In reaching this conclusion, the Delaware Superior Court relied upon United States v. Lombera-Camorlinga, 170 F.3d 1241, 1242-43 (9th Cir.1999). However, that decision was subsequently withdrawn, United States v. Lombera-Camorlinga, 188 F.3d 1177 (9th Cir.1999), and later overturned by United States v. Lombera-Camorlinga, 206 F.3d 882, 883-87 (9th Cir.) cert. denied, 531 U.S. 991, 121 S.Ct. 481, 148 L.Ed.2d 455 (2000). Furthermore, the Delaware Superior Court later declined to follow Reyes, holding that the denial of consular notification was not of constitutional dimension and that "the very decision that defendant relies onState v. Reyeswas based upon case law which has since been overruled. It is very likely that this court would decide the matter differently now based on the current state of the law regarding consular notification." State v. Vasquez, 2001 WL 755930 (Del.Super.2001).
We agree with the prevailing weight of authority that the exclusionary rule does not apply to evidence obtained when there has been non-compliance with Article 6 of the VCCR. Indeed, to hold otherwise would set forth an additional right to foreign nationals beyond those granted to American citizens under the Constitution. Here, defendant was given his Miranda rights in his native language and admitted that he understood them. This was sufficient to satisfy the constitutional requirements of Miranda and its progeny. See, United States v. Boon San Chong, 829 F.2d 1572, 1574 (11th Cir.1987); Perri v. Director Department. Of Corrections, 817 F.2d 448, 452-53 (7th Cir.), cert. denied, 484 U.S. 843, 108 S.Ct. 135, 98 L.Ed.2d 92 (1987); United States v. Gonzales, 749 F.2d 1329, 1336 (9th Cir.1984). Therefore, we find that the trial judge properly denied defendant's motion to suppress, and defendant's argument that he was denied effective assistance of counsel with respect to this issue has no substance. Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674, reh. denied, 467 U.S. 1267, 104 S.Ct. 3562, 82 L.Ed.2d 864 (1984); State v. Fritz, 105 N.J. 42, 58, 519 A.2d 336 (1987).
Affirmed.
NOTES
[1] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).