858 A.2d 4 (2004)
372 N.J.Super. 227
STATE of New Jersey, Plaintiff-Respondent,
v.
Leslie KING, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Submitted September 14, 2004.
Decided October 12, 2004.
*6 Yvonne Smith Segars, Public Defender, for appellant (Marcia Blum, Assistant Deputy Public Defender, of counsel and on the brief and supplemental brief).
Paula T. Dow, Assistant Attorney General, Acting Essex County Prosecutor, for respondent (Barbara A. Rosenkrans, Special Deputy Attorney General, of counsel and on the brief).
Before Judges STERN, WECKER and REISNER.
The opinion of the court was delivered by
STERN, P.J.A.D.
Defendant was convicted at a jury trial of murder, contrary to N.J.S.A. 2C:11-3a(1),(2) (count one), unlawful possession of a shotgun, in violation of N.J.S.A. 2C:39-5c(1) (count two), and possession of the shotgun for an unlawful purpose, contrary to N.J.S.A. 2C:39-4a (count three). The trial judge merged count three with count one and sentenced defendant to life imprisonment, with thirty years to be served before parole eligibility on the murder conviction, and to a concurrent five year term for the weapons offense based on defendant's possession of the shotgun without first having obtained a firearm purchaser's identification card. Defendant also received a concurrent seven year sentence, with 85% to be served before parole under the No Early Release Act (NERA), for an eluding offense to which he pled guilty. The parties agreed that NERA applied to that offense.
On this appeal defendant argues:
POINT I  WHERE THE STATE CALLED SEVEN EYEWITNESSES AND NONE OF THEM WAS ABLE TO IDENTIFY DEFENDANT AS THE MURDERER, THE COURT'S FAILURE TO INSTRUCT THE JURY THAT THE STATE HAD TO PROVE IDENTIFICATION BEYOND A REASONABLE DOUBT DENIED DEFENDANT HIS CONSTITUTIONAL RIGHTS TO PRESENT A DEFENSE AND TO A FAIR TRIAL. (Not Raised Below)
POINT II  WHERE SOME WITNESSES TESTIFIED THAT DEFENDANT WORE A BLACK COAT AND OTHERS SAID HE WORE A BRIGHT YELLOW VEST, AND SOME WITNESSES TESTIFIED THAT THE GUNMAN WORE A BLACK COAT AND OTHERS SAID HE WORE A YELLOW VEST, THE COURT'S FAILURE TO INSTRUCT THE JURY ON HOW TO EVALUATE SUCH CONFLICTING IDENTIFICATION TESTIMONY DENIED DEFENDANT HIS CONSTITUTIONAL RIGHTS TO PRESENT A DEFENSE AND TO A FAIR TRIAL. (Not Raised Below)
POINT III  WHERE SOME WITNESSES IDENTIFIED DEFENDANT AS "BROOKLYN" AND DEFENDANT DENIED THAT HE WAS KNOWN BY THAT NAME, IT WAS THE JURY'S JOB TO DECIDE WHETHER HE WAS KNOWN BY THAT NAME, BUT THE COURT TOOK THE ISSUE FROM THE JURY WHEN IT REPEATEDLY INSTRUCTED THAT "THE GRAND JURORS CHARGE THAT LESLIE RANDOLPH *7 KING, ALSO KNOWN AS BROOKLYN," COMMITTED THE ALLEGED OFFENSES. (Not Raised Below)
POINT IV  BECAUSE THE STATE FAILED TO ADVISE DEFENDANT, A GUYANESE NATIONAL, THAT HE HAD A RIGHT UNDER THE VIENNA CONVENTION TO CONTACT THE GUYANESE CONSULATE FOR ADVICE AND ASSISTANCE UPON HIS ARREST, ANY STATEMENTS THE POLICE OBTAINED FROM DEFENDANT FOLLOWING HIS ARREST WERE OBTAINED IN VIOLATION OF DEFENDANT'S PRIVILEGE AGAINST SELF-INCRIMINATION AND HIS RIGHT TO DUE PROCESS.
In a supplemental brief which we permitted defendant to file while the appeal was pending, defendant also argues "that his life term is illegal and unconstitutional" in light of the United States Supreme Court's recent opinion in Blakely v. Washington, 542 U.S. ___, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004).
Our careful review of the record convinces us that there is no basis for reversing the convictions and that only the following discussion is appropriate in a written opinion. R. 2:11-3(e)(2). We also uphold the challenged sentences in this case.

I.
The following facts, developed at the trial with respect to the shotgun killing of Lesley Jean Francois, were sufficient to sustain the jury's verdict.
On the night of November 26, 2000, and early morning of November 27, 2000, Francois and defendant were at the Rainbow Bar in Irvington. Francois had been drinking heavily. After dancing with Francois, a woman was talking with defendant while Francois was attempting to get her attention. Denton Howell, also known as "Dufer," who knew both Francois and defendant, told Francois not to "disrespect the man," referring to defendant, while he was talking to the woman. Due to the loud music in the bar and the nature of the discussion, Francois and Howell stepped outside to talk further about the matter. Thereafter, Francois' friends, defendant, the woman in question and others at the bar also went outside.
While outside, Francois' friend, Robenson Demande, started questioning the others about the problem. Howell then removed a .357 Magnum from his pocket and pointed it at Demande. Dwight Townsend, Howell and another man, known as Junior, thereupon pulled Demande around the corner. Demande testified that one of the men took his money while Howell was pointing a silver gun at him. They then heard a shot go off.
Howell looked around the corner to see what happened. He also fired "a single shot in the air," because he thought someone was firing at him. A few minutes after, the defendant, who was known to Howell as "Brooklyn" and was identified by Howell in the courtroom, walked up to Howell and asked him "to drop off [defendant's] car for him" at defendant's house. After leaving the bar, Howell "drop[ped] off" defendant's car and then buried the .357 Magnum gun in his own backyard. According to Howell, "Brooklyn" was wearing a light colored shirt and a black leather jacket that night.
Defendant visited Howell the next day. According to a statement Howell gave to the police, defendant told him "if the kid's not dead, he would have to kill him." At trial, Howell could not confirm that the statement was accurately reported. He *8 could not recall what defendant said to him at the time.
Howell further testified that he did not possess a shotgun at the bar that night. Howell, however, pled guilty and was sentenced on aggravated assault and possession of a weapon charges relating to the handgun he did possess and the events that occurred at the Rainbow Bar.
Demande incorrectly thought he "was the one who got shot" during a robbery when forced to go with the men at gunpoint. He observed the gun as "silver," like a .45, and "flat," not round. According to Demande, Howell could not have shot Francois because he was in front of Demande when the shot went off.
Townsend also saw Howell with a gun, but not a shotgun. After the shot was fired and the crowd started to disperse, Townsend went around the corner and saw a man with a shotgun in his hand. He also heard someone yell "Brooklyn did it." Townsend saw the man inside the bar wearing a hooded sweatshirt. He did not know the shooter and did not identify him in court.
Franco Charles also walked outside of the bar and witnessed someone coming across the street towards Francois with "something in his hand." The person "pulled out a gun" and shot Francois. He described the shooter as wearing "a yellow vest," with dark sleeves. He was unable "to make out" the shooter's face. After the shooting, he also witnessed the shooter walk away.
Katrina Johnson, another patron of the bar, testified that the defendant was wearing "a yellow hood and a beige vest." She knew the defendant as "Brooklyn." In her statement to the police, she described "Brooklyn" as wearing a black vest, yellow sweater, blue jeans and a tan hat.
Denise Hyman, another patron at the bar, also testified that the defendant was known as "Brooklyn." She stated that he was wearing "a yellow vest," a black hooded sweatshirt, black pants and a hat.
The Medical Examiner determined that the cause of death was a shotgun wound to the chest, at close range, approximately three feet or less in distance. The victim had a blood-alcohol level of .130 percent.
On December 1, 2000, the defendant was arrested after a vehicle chase. Defendant testified at trial that he did not stop because his "license was suspended."[1] The car ultimately crashed and defendant sustained injuries resulting in surgery and placement of a steel rod inside his leg.
Detective Bobby Goines of the Irvington Police Department visited defendant at the hospital on the afternoon of December 2, 2000. He spoke to the defendant and realized he was in "bad condition." Goines handed defendant a business card to give to the guarding officer so Goines could be contacted when defendant was "ready" and felt "like talking to [him]."
At around 7:30 p.m. that evening, Goines received a telephone call informing him that the defendant wanted to talk. Goines returned to the hospital. Because defendant was still in a lot of pain, Goines told him to call back when he was in better condition.
On the night of December 3, 2000, Goines received another call that the defendant wished to talk to him. Goines returned to the hospital. Defendant thanked him for his prior courtesy, and said that he was willing to give a statement. *9 After Miranda[2] warnings were administered, defendant gave a statement when Investigator Quovella Maeweather of the Essex County Prosecutor's Office arrived. Defendant advised Maeweather that he read and signed the Miranda form which she then witnessed. Maeweather also transcribed the interview between Goines and defendant. The defendant reviewed the statement and signed it. Maeweather witnessed him sign the statement.
In his statement, defendant stated that he used to be known by the name "Brooklyn"; that he was talking to a woman at the bar when a man walked over and pulled the woman's hair; that the "guy said we can take it outside"; and after "Dufer" unsuccessfully tried "to fix everything up," everyone went outside. When outside the bar, defendant heard two shots, "[o]ne came from across the street by the club [and the] other from the corner of 16th Avenue somewhere." According to defendant, he "grabbed" a shotgun and fired "at the person who fired at [him] from across the street," that it was the "same guy from inside the club," and that he "hit" the man, and "dropped the gun and ran." He stated that he was in the street between the bar and the gas station, about six to seven feet away from the victim, when he fired. The victim was "in front of the club doors" when the defendant fired at him.
Defendant further stated that he "grabbed" the shotgun from someone standing next to him. He then gave Howell the keys to his car, walked home and took Howell home after Howell drove the car to his house.
The defendant also testified at trial. He testified that he went to the Rainbow Bar on November 26, 2000 around midnight. He was most likely wearing jeans, a gray hooded sweatshirt, a black jacket and a hat. He drove his girlfriend's red Oldsmobile to the bar and parked it at the gas station across the street from the tavern. Before the defendant entered the bar, Howell was outside and requested to use the defendant's car to pick up another person. Defendant gave Howell the keys and then walked into the bar. While the defendant was talking to a young woman, Francois came up to the woman and pulled at her. Francois was drunk. The defendant told Francois he was talking to the woman and that she would be available when he finished. Francois and the defendant started arguing. The defendant informed Francois that he had not come to the bar for any altercations and turned his back on Francois. When he turned around, Howell and Francois were arguing, as defendant continued his conversation with the woman.
When Francois and Howell stepped outside the bar, others followed. Defendant decided he was going to leave and went across the street to his car, but realized that Howell had his keys. He started to look for Howell when he heard a loud gunshot. He ducked and then looked around. He saw Howell with a couple of people around the corner from the entrance to the bar. Then he heard a second shot which made a different sound from the first.
The defendant further testified that a man next to him had a gun, with a round barrel and a brown handle, in his hand. The man was "scared as hell to use it." So defendant "grabb[ed]" the gun from the man and fired across the street in the direction from which the shots were being fired towards him. The defendant also testified that, "to his knowledge," he did *10 not hit anyone. Then he "laid" the gun back on the ground.
The defendant thereafter went across the street to see Howell, who had a "big gun" in his hand. He told Howell to "take my car, handle your business and drop it off at my house later." The defendant then started to walk home, but ultimately took a cab to his house. When Howell arrived with the defendant's car, he took him home. Later on November 27, 2000, the defendant went to Howell's house to discuss what happened earlier that morning, but Howell was "no help" in telling the defendant about the events that occurred in front of the bar.
After being released on the eluding charge, defendant "turn[ed him]self in" to the police on the present indictment after being told he had been charged with those crimes.
The defendant also testified that he is not known as "Brooklyn," and that he was "[n]ever" called by that name, although he once lived there. He stated that he does not own a twelve-gauge shotgun. The defendant further testified that he did not recall giving a statement to the police.
None of the witnesses who testified for the State expressly identified defendant as the man who shot Francois. However, in addition to the testimony, including that of defendant, that defendant fired a gun in the direction of where Francois was standing following the verbal exchange over a woman in which both were interested, there was testimony that defendant was wearing clothing matching that observed on the killer.

II.
Defendant contends that the trial judge erred by not specifically instructing the jury on the State's burden to prove identification when none of the eyewitnesses identified him as the assailant. In response, the State argues that defendant invited the error by requesting the trial judge not to give an instruction on identification and should, therefore, be precluded from raising the claim on appeal.
At the charge conference, the trial judge reviewed the instructions he planned to give, including lesser-included offenses, defenses and factual assertions. Specifically with respect to the issue of identification, the judge summarized the position of counsel:
It's my understanding that identification is not sought by either the State or the defendant as a model charge here, inasmuch as the defendant, by his own testimony indicates that he was at the scene at the time of the offenses alleged, although he denies that he was the person who committed them. And I do not intend to charge false-in-one; false-in-all. I believe both counsel agree that that not be charged.
Defense counsel indicated that she had "no" disagreement with the judge's summary.
Moreover, in summation, after noting that no one at the scene of the crime "made an in-court identification of my client as the person with the shotgun who shot Mr. Francois," counsel stated:
Now, basically, this is not an identification case. Because if it was, I just pack up and go home. The State has not put any witness on who identifies my client as the shooter. This is, ladies and gentlemen, a case about statements.
Counsel further noted "that a lot of statements were taken from civilian witnesses and from my client," and that the case was commenced and premised on defendant's admission that he "discharged a shotgun." The thrust of the defense was that the State built its case around the defendant's *11 statement but that the statement, if any, was actually given in the hospital room, was involuntary, and did not "contain... the truth." According to counsel, defendant did not "recall giving the statement, though he does say he signed it."
Because defendant asserted that although he fired a weapon, his shot did not hit the victim, we incline to the view that a charge relative to identification should have been given to the jury. See, e.g., State v. Robinson, 165 N.J. 32, 40-41, 754 A.2d 1153, 1158 (2000); State v. Green, 86 N.J. 281, 288-294, 430 A.2d 914, 917-921 1981); State v. Copling, 326 N.J.Super. 417, 431-34, 741 A.2d 624, 632-34 (App.Div.1999), certif. denied, 164 N.J. 189, 752 A.2d 1290 (2000). A critical issue in the case is whether defendant was the person who shot the victim and caused his death.
However, we cannot conclude under these circumstances that the trial court committed "plain error" by not so charging. See State v. Green, supra, 86 N.J. at 289, 430 A.2d at 917-18; State v. Macon, 57 N.J. 325, 338, 273 A.2d 1, 8 (1971); R. 2:10-2. "[T]he issue is whether the failure to instruct the jury as to identification created a possibility of injustice sufficient to raise a reasonable doubt as to the propriety of the jury's conviction." State v. Copling, supra, 326 N.J.Super. at 431-32, 741 A.2d at 632. Resolution of that issue requires a "highly fact-sensitive" analysis. State v. Green, supra, 86 N.J. at 291-92, 430 A.2d at 919; State v. McNeil, 303 N.J.Super. 266, 272, 696 A.2d 757, 760 (App.Div.1997); State v. Salaam, 225 N.J.Super. 66, 69-72, 541 A.2d 1075, 1076-78 (App.Div.1988); State v. Frey, 194 N.J.Super. 326, 329-30, 476 A.2d 884, 885-86 (App.Div.1984).
Defendant admitted that he was at the scene and, in fact, testified that he fired a shotgun toward the victim. On the other hand, as defendant was not specifically identified by any witness, the traditional identification charge was not appropriate.[3] Therefore, while we do not accept the State's assertion that identification was not a "crucial issue," and believe that specific reference to the subject of identification was warranted, see State v. Copling, supra, 326 N.J.Super. at 432-33, 741 A.2d at 632-33, because identification of the person who shot Francois was in contest,[4] we find no "plain error" warranting reversal. This case involves more than a mere failure by defense counsel to request a specific instruction or objection to its omission. Here defense counsel expressly declined an instruction on the subject and affirmatively asserted that identification was not an issue in the case.
We are more than satisfied that the judge's charge as a whole, including the instructions on burden of proof, culpability and causation, were adequate to assure defendant a fair trial in which the jury was obligated to determine, by proof beyond a reasonable doubt, that defendant was the actor who shot Francois. In her *12 summation, defense counsel attacked that conclusion by stressing that the principal investigator, Goines, prematurely closed his investigation because witnesses said the shooter was wearing a yellow vest, others said a person nicknamed "Brooklyn" was wearing a yellow vest, and that defendant was identified as "Brooklyn." She also asserted that Howell was the killer, that defendant's close friends did not see defendant with a yellow vest, and that his conduct was inconsistent with proofs required to satisfy the State's burden. It was thus clear to the jury that it had to find that this defendant not only was at the scene and shot in the direction of the victim, but actually was the one who caused his death. The jury instructions required no less.
In essence, in these circumstances, in which defendant acknowledged both his presence at the scene and shooting of a gun, but no witness identified him as the shooter, combined with his counsel's affirmative decision not to ask for an identification charge, we can find no "plain error" warranting reversal because the trial judge did not expressly instruct the jury on the subject of identification. Cf. State v. Garron, 177 N.J. 147, 179-81, 827 A.2d 243, 262-63 2003) (trial judge has independent obligation to charge lesser-included offense).[5]

III.
We also reject defendant's argument that the trial judge committed plain error when he read the indictment which alleged that "Leslie Randolph King, also known as Brooklyn" committed the three offenses. Defendant argues that by reading the indictment with "the alias" included, the court removed the disputed issue as to whether the defendant was known as "Brooklyn." However, in his instructions, the judge made clear that "the indictment is not evidence bearing upon the issue of whether the defendant is guilty or not guilty of any charge stated in the indictment." With respect to the murder charge, the judge also made clear "that the defendant has pleaded not guilty to the count. And the fact that I read it is to provide a context for you and not to give any more emphasis to one side or the other. Remember, he's pled not guilty to this."
Moreover, the nickname provided relevant proof in the case. Contemporaneous declarations and identifications referred to "Brooklyn" as the shooter, and several witnesses testified that they knew the defendant as "Brooklyn." The defendant, in his statement to the police, acknowledged that he was known as "Brooklyn," although he no longer used that name. At trial, the defendant testified that he was never called by the name "Brooklyn," although he had lived in Brooklyn. Whether the defendant was known as "Brooklyn" was a contested issue at trial.
Use of the name "Brooklyn" was neither prejudicial nor an ominous sounding alias. Rather, as developed in the evidence, it was a nickname allegedly associated with the defendant. Therefore, its inclusion in the reading of the indictment *13 does not warrant reversal. See State v. Paduani, 307 N.J.Super. 134, 146-47, 704 A.2d 582, 588-89 (App.Div.1997), certif. denied, 153 N.J. 216, 708 A.2d 67 (1998). As we noted in Salaam, supra, 225 N.J.Super. at 73, 541 A.2d at 1078, "[t]he principal objection to the use of an alias in a criminal proceeding is that an alias implied that the defendant belongs to the criminal class and thereby prejudices the jury." Ibid. at 73, 541 A.2d at 1078. However, even then, "the majority of decisions involving this issue hold that the admission of irrelevant aliases into evidence will not afford a basis of reversal unless some tangible form of prejudice is demonstrated, i.e. where such names have been intentionally offered as indicia of guilt." Ibid.

IV.
Defendant argues that his statement to the police must be suppressed because the Vienna Convention on Consular Relations and Optional Protocol on Disputes, April 24, 1963, art. 36, 21 U.S.T. 77, T.I.A.S. No. 6820 (Convention) was violated when the police failed to notify him of his right to contact the consulate of his native country before giving his statement to the police.[6]
Defendant is a citizen of Guyana. Both Guyana and the United States are signatories to the Convention, which was ratified by Congress in 1969. The Convention is a multi-lateral treaty addressing the establishment of consular relations between signatory nations. See State v. Homdziuk, 369 N.J.Super. 279, 288, 848 A.2d 853, 859 (App.Div.2004). It protects foreign nationals who are detained or placed in custody. State v. Jang, 359 N.J.Super. 85, 92, 819 A.2d 9, 13 (App.Div.), certif. denied, 177 N.J. 492, 828 A.2d 919 (2003).
However, we have repeatedly declined to find a private enforceable right under the Convention, Homdziuk, supra, 369 N.J.Super. at 289, 848 A.2d at 859 (citing State v. Cevallos-Bermeo, 333 N.J.Super. 181, 185-87, 754 A.2d 1224, 1227-28 (App.Div.), certif. denied, 165 N.J. 607, 762 A.2d 221 (2000); Jang, supra, 359 N.J.Super. at 94, 819 A.2d at 15), nor found it to require suppression of a statement given in the absence of knowledge of the rights it provides. Jang, supra, 359 N.J.Super. at 88, 93-94, 819 A.2d at 11, 14-15; Cevallos-Bermeo, supra, 333 N.J.Super. at 187-188, 754 A.2d at 1228. To the contrary, we have recently held that the exclusionary rule is not applicable as a remedy for violation of Article 36 of the Convention. Homdziuk, supra, 369 N.J.Super. at 289-90, 848 A.2d at 859-60. We add only that the defendant spoke English and the record reflects that he was advised of his Miranda warnings prior to giving his statement, and knowingly and voluntarily waived those rights.

V.
By supplementary brief, defendant contends that the life sentence for murder must be reduced, and a thirty-year term imposed, as a result of the United States Supreme Court's recent opinion in Blakely v. Washington, 542 U.S. ___, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004). In Blakely, the United States Supreme Court repeated its holding in Apprendi v. New Jersey, 530 U.S. 466, 490, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), that "other than the fact of a *14 prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." Blakely, supra, 542 U.S. ___, 124 S.Ct. 2531, 159 L.Ed.2d 403. The majority also stated that "our precedents make clear ... that the `statutory maximum' for Apprendi purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant." (Emphasis in original; citations omitted.) Thus, defendant argues, because in New Jersey the presumptive sentence for each degree of crime cannot be raised without the judge's finding of an aggravating factor or factors not found by the jury, the "presumptive term" cannot be raised in the absence of a jury determination relating to that factor or factors. We need not address the issue because we conclude there is no presumptive sentence for murder, and no additional "real time" results from the concurrent sentence imposed for the weapons violation.
Defendant argues that the "statutory maximum" or "presumptive sentence" for murder at the time of this offense was thirty years, and that that term was raised because the trial judge found aggravating factors not found by the jury. Defendant does not contend that the mandatory ineligibility term of thirty years, as established by the Legislature, has to be vacated.
We reject defendant's argument addressed to the specific term. At the time of this offense, N.J.S.A. 2C:11-3b provided (as it does now) that
[m]urder is a crime of the first degree but a person convicted of murder shall be sentenced, except as provided in subsection c of this section [relating to capital punishment], by the court to a term of 30 years, during which the person shall not be eligible for parole, or be sentenced to a specific term of years which shall be between 30 years and life imprisonment of which the person shall serve 30 years before being eligible for parole.[7]
There is no presumptive sentence for murder provided by the Legislature, see N.J.S.A. 2C:44-1f(1) (excepting murder from the presumptive term provisions) and none established by case law.[8] Therefore, even assuming that Blakely prevents a judge from raising a "presumptive term" based on aggravating factors embodied in N.J.S.A. 2C:44-1(a), there was no presumptive term for murder, at least none less than life imprisonment, and the judge could impose a sentence in the range of thirty years to life imprisonment without making fact-finding which raised the presumptive. Stated differently, because there is no "presumptive sentence" for murder, the "statutory maximum" for *15 purposes of Apprendi and Blakely is life imprisonment.
We recognize that we have sustained life sentences for murder based on the judicial assessment that the aggravating factors outweigh the mitigating. See State v. Soto, 340 N.J.Super. 47, 71-72, 773 A.2d 739, 754 (App.Div.), certif. denied, 170 N.J. 209, 785 A.2d 438 (2001); State v. Torres, 313 N.J.Super. 129, 161-64, 713 A.2d 1, 17-19 (App.Div.), certif. denied, 156 N.J. 425, 719 A.2d 1023 (1998). See also State v. Zadoyan, 290 N.J.Super. 280, 289-92, 675 A.2d 698, 703-05 (App.Div.1996) (carjacking). But that does not mean that there is a "presumptive sentence" less than life for murder or that, for constitutional purposes, the "statutory maximum" is less than the top of the range in the absence of some legislative intent providing otherwise.
The sentence on the weapons offense does involve raising the presumptive term from four years to five. See N.J.S.A. 2C:43-6a(3); 2C:44-1f(1). The judgment refers to aggravating factors:
1. The nature and circumstances of the offense, and the role of the actor therein, whether or not it was committed in an especially heinous, cruel, or depraved manner.
3. The risk that defendant will commit another offense.
9. The need for deterring defendant and others from violating the law.
In finding that "[t]he preponderance of aggravating factors favors a higher term" than the presumptive, the judge also found that mitigating factor seven applied, that is "[t]he defendant has no history of prior delinquency or criminal activity has led to a law-abiding life for a substantial period of time before the commission of the present offense."[9]
A reading of the trial judge's remarks at sentencing make clear that aggravating factor number one was found in light of the manner in which the shooting occurred because "the almost execution style of the behavior that resulted in the death here [was] cold and calculated," "almost business like." When referring to aggravating factor number one, the judge said that it applied because of "the very direct and execution style, cool detached behavior and role of the defendant."[10]
Thus, the aggravating factors used to increase the presumptive sentence for the weapons offense did not include factor one. To the extent the other aggravating factors were related to the offense because defendant did not have a record and they cannot be said to be subject to Blakely's exception permitting the judge to make fact-finding relating to prior convictions, 542 U.S. at ___, 124 S.Ct. at 2536; see also, e.g., State v. Dixon, 346 N.J.Super. 126, 140, 787 A.2d 211, 221 (App.Div.2001) (persistent offender statute upheld) certif. denied, 172 N.J. 181, 796 A.2d 898 (2002), the sentence in this case was concurrent and far shorter than the sentence for murder with its thirty-year parole ineligibility term. It was also concurrent to and far shorter than the uncontested sentence with the NERA term for eluding to which he pled guilty. As a result, even if Blakely prohibits the trial judge from using an aggravating factor *16 or factors not found by the jury, and not based on prior convictions, to increase the specific term sentence imposed (an issue we do not decide), it was harmless in this case. Suffice it to say, therefore, that with respect to the five year sentence imposed on the weapons offense, the trial judge made findings which, under traditional New Jersey law, permitted the increase of the presumptive term. See State v. Roth, 95 N.J. 334, 363-64, 471 A.2d 370, 386 (1984).

VI.
The judgment is affirmed.
NOTES
[1] This was apparently the event resulting in the eluding charge to which he pled guilty. No issue is raised before us with respect to that conviction and sentence.
[2] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[3] Our opinions address the identification charge in the context of a specific out-of-court and/or in-court identification. The model charge on that subject instructs the jury to examine the reliability and credibility of the specific identification. Given the testimony in this case, and the absence of any specific identification of defendant as the shooter, the model charge would have been inappropriate. Before us, however, defendant attaches the first and last paragraphs of the model charge on "identification: in-court and out-of-court identifications," and urges it should have been given. As noted, we are inclined to the view it should have been, at least upon request.
[4] The State also argues that defendant's pretrial statement had "the aura" of asserting self-defense, but the trial judge declined to charge self-defense over defendant's objection.
[5] In so concluding, we do not necessarily accept the State's assertion that defense counsel purposefully decided not to request an identification instruction because it "would have focused the jury's attention on the strong circumstantial evidence that enveloped the defendant as Francois' killer [and] the jury's concentration on that evidence linking the defendant to Francois' death would have detracted the jury's attention from the defense linchpin that no one positively identified defendant as the shooter." Accordingly, we do not preclude a petition for post-conviction relief based on the failure of defense counsel to request the instruction.
[6] The defendant also argued before the trial judge that the statement should be suppressed because it was not made voluntarily and knowingly as he was under the influence of medication and he had no recollection of giving the statement. As already noted, the trial judge found that the defendant made the statement voluntarily and knowingly. That decision is not challenged on this appeal.
[7] N.J.S.A. 2C:11-3(b) also provides for life imprisonment without parole in certain circumstances when the death penalty is not imposed. See also N.J.S.A. 2C:43-7.2 (N.E.R.A.) for offenses occurring after June 29, 2001.
[8] See legislative history of N.J.S.A. 2C:11-3b, 2C:43-7a(1), (2), and 2C:44-1f(1) and the amendments thereto; State v. Serrone, 95 N.J. 23, 26 n. 2, 468 A.2d 1050, 1051 n. 2 (1983) (presumptive term of life imprisonment if extended term was imposed for murder for offense occurring between September 24, 1981 and August 6, 1982). Under the Code, as it stood between its effective date of September 1, 1979 and August 6, 1982, an extended sentence could be imposed as an ordinary term sentence for murder. State v. Serrone, supra; State v. Maguire, 84 N.J. 508, 423 A.2d 294 (1980). Sentences for murder are now provided for in chapter 11, independent of the Code provisions relating to ordinary and extended terms, see, e.g., State v. Manzie, 335 N.J.Super. 267, 762 A.2d 276 (App.Div.2000), aff'd, 168 N.J. 113, 773 A.2d 659 (2001).
[9] No issue is raised concerning the presumption against imprisonment with respect to the third degree weapons offense in these circumstances. N.J.S.A. 2C:44-1e.
[10] In case of any inconsistency between what was said by the judge at sentencing and the judgment, the former controls. See, e.g., State v. Womack, 206 N.J.Super. 564, 503 A.2d 352 (App.Div.1985).