819 A.2d 9 (2003)
359 N.J. Super. 85
STATE of New Jersey, Plaintiff-Respondent,
v.
Jshik JANG, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Submitted March 5, 2003.
Decided March 28, 2003.
*11 Yvonne Smith Segars, Public Defender, for appellant (Robert L. Sloan, Assistant Deputy Public Defender, of counsel and on the brief).
Peter C. Harvey, Acting Attorney General, for respondent (Michael J. Williams, Deputy Attorney General, of counsel and on the brief).
Before Judges CONLEY, CARCHMAN and PARRILLO.
*10 The opinion of the court was delivered by CARCHMAN, J.A.D.
Following an unsuccessful motion to suppress his confession and then a jury trial, defendant Jshik Jang, a South Korean national and illegal alien, was convicted of first-degree murder, N.J.S.A. 2C:11-3a(1), (2); first-degree attempted murder, N.J.S.A. 2C:5-1, N.J.S.A. 2C:11-3a (1), (2); first-degree armed robbery, N.J.S.A. 2C:15-1; two counts of first-degree felony murder, N.J.S.A. 2C:11-3a(3); second-degree armed burglary, N.J.S.A. 2C:18-2; two counts of third-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5b, -4d; and second-degree unlawful possession of a weapon, N.J.S.A. 2C:39-4a. He was sentenced to an aggregate term of life in prison with a forty-year period of parole ineligibility. The dominant issue on this appeal is whether a conviction may be overturned for failure of the State to comply with the provisions of the Vienna Convention on Consular Relations and Optional Protocol on Disputes, Apr. 24, 1963, art. 36, 21 U.S.T. 77, T.I.A.S. No. 6820, 596 U.N.T.S. 261, (VCCR). We conclude that absent a showing of prejudice, a failure to comply with the provisions of the VCCR will not result in a reversal of a conviction.
We address the issue in the context of these facts. In the late evening of January 4, 1995, defendant went to the home of Michael Suh with Jin Sig Choi and another individual identified only as "Mr. Lee" for the purpose of "get[ting] some money" from Suh, a successful businessman known to possess large sums of cash. When Suh pulled into his garage at approximately 11:30 p.m., he was confronted by a man wearing a ski mask and standing next to Suh's wife's car. In an effort to warn his wife, who with her mother and two children was in the home, Suh sounded his horn. Suh, through his rear-view mirror, then observed another masked individual walking towards the driver's window. This second masked man aimed a gun at Suh and pulled the trigger twice, but the gun did not fire. Suh shifted his car into reverse, striking the garage door, and proceeded back down the driveway; the gunman followed him. Mrs. Suh entered the garage from the house and was tackled by the other masked man, who then stabbed her eleven times, killing her.
None of the perpetrators were apprehended at the scene, but investigators recovered the gun used in the robbery near the Suh home. The bloody knife used to stab Mrs. Suh was recovered nearby as well.
Defendant was implicated in the crime as a result of a trace of the serial number on the recovered gun that revealed a chain of sales eventually ending with a sale of the weapon to Choi and defendant. When *12 the police also determined that Choi owned a white and silver Chevrolet Blazer, the vehicle observed at the scene of the murder, they contacted the television show "America's Most Wanted" to conduct a profile of the case. The airing of that show resulted in a call from Tacoma, Washington advising of defendant's presence there, and eventually led to the surrender of defendant in Missoula, Montana.
Detective Sergeant Richard Cary of the Paramus Police Department, Detective Mark Bendul and Lieutenant Joseph Hornyak of the Bergen County Prosecutor's Office traveled to Tacoma, Washington and then to Montana where they interviewed defendant with U.S. Immigration and Naturalization Service (INS) Special Agent Jake Stavlo in the Jefferson County Jail in Bolder, Montana. The INS's involvement was prompted by the issuance of a complaint and arrest warrant charging defendant as an illegal alien in possession of a firearm. Prior to this interview, defendant was informed that the South Korean Consulate would be advised of his arrest and custody the next day, and Special Agent Stavlo did contact the South Korean Consulate the following day. Defendant was also advised of his Miranda[1] rights in both English and Korean. He read the Miranda card in Korean, wrote "yes" next to each of the Miranda rights, and signed his name in English in the waiver portion of the Miranda form. Special Agent Stavlo questioned defendant in English, and Detective Bendul, a Korean by birth, interpreted the questions into Korean.
Defendant minimized his involvement in the murder. He admitted that he bought the gun as well as the knife used to kill Mrs. Suh, and had purchased and placed in Choi's Chevrolet Blazer the ski masks used in the burglary, but he claimed that he did not know about the burglary and stayed in the back seat of the vehicle the entire time as he had a "bad back." He denied driving the Chevrolet Blazer, and asserted that Choi operated the vehicle, as defendant remained in the back seat. Notably, defendant had no reply to the investigators' perhaps rhetorical question: "If you had a bad back and you couldn't participate in this attempted robbery, why would Choi and Lee even think about bringing you there?"
Later in the morning of May 4, 1996, defendant was transported to the INS office in Helena, Montana to undergo processing for the federal immigration charge, and Special Agent Stavlo and Detective Bendul again met with defendant, informing him of his Miranda rights for a second time. Defendant subsequently made a formal statement while at the INS office, terminating the interview by stating: "I don't want to talk anymore. Take me to jail."
Defendant moved to suppress his confession claiming that it was coerced. Following a Miranda hearing, the judge rejected defendant's claim and found:
[D]efendant freely and voluntarily waived his right to counsel. He freely and voluntarily gave statements to the police. He knew what he was doing. He wanted to make the statements. He voluntarily turned himself in to the police. He was clearly informed of his rights, of his Miranda warnings, on more than one occasion, and therefore, the motion to dismiss for failure to give appropriate Miranda warnings is dismissed.
Defendant also claimed that his rights under the VCCR were violated. The judge rejected that claim, as well, and following a *13 trial, defendant was convicted and sentenced. He now appeals.
On appeal, defendant raises the following arguments.
POINT I
BECAUSE OF THE STATE'S FAILURE TO ADVISE DEFENDANT, A SOUTH KOREAN NATIONAL, OF HIS OWN RIGHT UNDER THE VIENNA CONVENTION TO CONTACT THE SOUTH KOREAN CONSULATE FOR ADVICE AND ASSISTANCE AT THE TIME OF HIS ARREST, DEFENDANT'S SUBSEQUENT STATEMENTS TO THE POLICE WERE OBTAINED IN VIOLATION OF HIS PRIVILEGE AGAINST SELF-INCRIMINATION AND HIS RIGHT TO DUE PROCESS OF LAW. U.S. CONST. AMENDS. V, XIV; N.J. CONST. (1947) ART. I, PARS. 1, 9, 10.
POINT II
IMPROPER SUMMATION COMMENTS, DESIGNED TO INFLAME THE JURY WITH AN UNFOUNDED CLAIM THAT THE VICTIM GAVE HER LIFE TO SAVE THE REST OF HER FAMILY, DEPRIVED DEFENDANT OF THE RIGHT TO DUE PROCESS OF LAW AND A FAIR TRIAL. U.S. CONST. AMEND. XIV; N.J. CONST. (1947) ART. I, PARS. 1, 9, 10. (Not Raised Below)
POINT III
THE IMPOSITION OF CONSECUTIVE TERMS FOR ATTEMPTED MURDER AND MURDER WAS MANIFESTLY EXCESSIVE.
POINT IV
THE CONVICTION FOR ROBBERY SHOULD HAVE BEEN MERGED. (Not Raised Below)
We first address the issue of the alleged failure of the State to comply with the VCCR. The VCCR is a binding multi-lateral treaty to which over 160 nations are parties. Rebecca E. Woodman, International Miranda? Article 36 of the Vienna Convention on Consular Relations, 70 J. Kan. B. Ass'n 41, 42 (2001). Among the other purposes and objectives of the treaty, it is intended "to protect foreign nationals, particularly those detained or in custody." Mark J. Kadish, Article 36 of the Vienna Convention on Consular Relations: A Search for the Right to Consul, 18 Mich. J. Int'l L. 565, 611 (1997). The VCCR is a self-executing treaty, meaning that it is the equivalent of an act of Congress. Woodman, supra, 70 J. Kan. B. Ass'n at 42 (citing Kadish, supra, 18 Mich. J. Int'l L. at 613 n. 147). Both the Republic of Korea and the United States are signatories of the VCCR.
The operative provision of the VCCR that is implicated by this case is Article 36, which provides:
1. With a view to facilitating the exercise of consular functions relating to nationals of the sending State:
(a) consular officers shall be free to communicate with nationals of the sending State and to have access to them. Nationals of the sending State shall have the same freedom with respect to communication with and access to consular officers of the sending State;
(b) if he so requests, the competent authorities of the receiving State shall, without delay, inform the consular post of the sending State if, within its consular district, a national of that State is arrested or committed to prison or to custody pending trial or is detained in any other manner. Any communication addressed to the consular post by the person arrested, in *14 prison, custody or detention shall also be forwarded by the said authorities without delay. The said authorities shall inform the person concerned without delay of his rights under this sub-paragraph;
(c) consular officers shall have the right to visit a national of the sending State who is in prison, custody or detention, to converse and correspond with him and to arrange for his legal representation. They shall also have the right to visit any national of the sending State who is in prison, custody or detention in their district in pursuance of a judgment. Nevertheless, consular officers shall refrain from taking action on behalf of a national who is in prison, custody or detention if he expressly opposes such action.
2. The rights referred to in paragraph 1 of this Article shall be exercised in conformity with the laws and regulations of the receiving State, subject to the proviso, however, that the said laws and regulations must enable full effect to be given to the purposes for which the rights accorded under this Article are intended.
[VCCR, supra, art. 36, 21 U.S.T. 77, T.I.A.S. No. 6820, 596 U.N.T.S. 261 (emphasis added).]
Because self-executing treaties give rise to judicially enforceable rights, Woodman, supra, 70 J. Kan. B. Ass'n at 42 (citing Foster v. Neilson, 27 U.S. 253, 314, 2 Pet. 253, 7 L.Ed. 415 (1829)), two issues arise regarding the VCCR and specifically Article 36:(1) whether the VCCR confers an individual right to notification such that a citizen of a signatory nation has standing to enforce this right; and (2) whether there is a judicially enforceable remedy for a violation of this right. Id. at 43; see also Kadish, supra, 18 Mich. J. Int'l L. 565.
While not addressing these issues directly, in a capital case involving an Ecuadorean national where the State failed to notify the Ecuadorean Consulate of the defendant's arrest, indictment or prosecution, we implied standing and established as a condition precedent for enforcing any claim under the VCCR that, "absent a showing of prejudice to defendant, a criminal conviction will not be overturned because the terms of the Convention have not been observed." State v. Cevallos-Bermeo, 333 N.J.Super. 181, 182-83, 754 A.2d 1224 (App.Div.), certif. denied, 165 N.J. 607, 762 A.2d 221 (2000).
We expounded on the elements of prejudice. "To establish prejudice, defendant must produce evidence that: 1) he did not know his right; 2) he would have availed himself of the right had he known of it; 3) there was a likelihood that contact with the consul would have resulted in assistance to him." Cevallos-Bermeo, supra, 333 N.J.Super. at 187, 754 A.2d 1224 (adopting three-prong test set forth in United States v. Villa-Fabela, 882 F.2d 434, 440 (9th Cir.1989), overruled on other grounds, United States v. Proa-Tovar, 975 F.2d 592 (9th Cir.1992)). Here, defendant satisfies the first prong of this test as he was not told that he could contact the consulate; Special Agent Stavlo informed the consulate himself. Defendant asserts that he would have contacted the consulate if so advised, thus satisfying prong two. As to prong three, he claims that if he had contacted the consulate, "he certainly would have been advised of the potential for consultation with a Korean-speaking attorney. Such advise [sic] from the consulate would reasonably have led defendant to request counsel and to decline to speak with the police until he consulted an attorney." We reject defendant's arguments. His generalized claim as to what may have happened if he had contacted the *15 consulate is no different in degree from the "vague and general" allegations of prejudice that we rejected in Cevallos-Bermeo. As we noted in Cevallos-Bermeo:
Even assuming that the first two prongs are satisfied, defendant must satisfy prong three. Defendant asserts general claims of prejudice ("the consular officer can identify potential problems and obstacles the national may face in an unfamiliar and strange legal system," bridge "cultural gaps" and "facilitate an active defense"). He also claims that the consul
would likely have communicated directly with the Hudson County Prosecutor's Office immediately to ascertain the status of defendant's case and the options that the Prosecutor was considering. The consul could have opened a dialogue with that Office, which would have resulted in the consul presenting whatever facts and legal argument it could muster on defendant's behalf.
These claimed prejudices are vague and general, and could apply to any foreign national who was not advised of his right to contact the consul. Moreover, contrary to defendant's insinuation, the consul cannot render legal advice. United States v. Alvarado-Torres, 45 F.Supp.2d 986, 992 (S.D.Cal.1999). Accordingly, we conclude that defendant has failed to establish any remediable prejudice due to the State's failure to comply with the Convention.
[Cevallos-Bermeo, supra, 333 N.J.Super. at 187-88, 754 A.2d 1224.]
But there is a more defining distinction. No contact was made in Cevallos-Bermeo; however here, Agent Stavlo contacted the consulate, and yet, no Korean-speaking attorney or assistance was forthcoming.
Also, defendant received his Miranda rights in both English and Korean, and he signed the Miranda card next to each statement of his rights. Defendant was interviewed by the police in Korean and had turned himself in to the police, wanting to tell his story. Defendant was cooperative and "eager for [the officers] to believe his story." Defendant also asserted his right to silence at both of his interviews, ending the questioning. Defendant was aware of his rights, and chose to tell the police his story. In sum, we find no error here warranting our intervention; and absent prejudice, we need not address the more expansive issues urged by defendant.
We now address the issue of the prosecutor's summation. During his summation, the prosecutor commented that Mrs. Suh had sacrificed her life to save her family by entering the garage, and referred to this act as her "last act of heroism." There was no objection, and the judge charged the jury prior to the trial and its deliberations that "[a]rguments, statements, remarks, openings and summations of the attorney are not evidence and should not be treated as evidence."
The prosecutor's remarks were inappropriate and not supported by the record. Defendant correctly notes that they were made to generate sympathy for the victim and inflame the jury.
"Prosecutors are afforded considerable leeway in closing arguments as long as their comments are reasonably related to the scope of the evidence presented." State v. Frost, 158 N.J. 76, 82, 727 A.2d 1 (1999). While prosecutors "are expected to make vigorous and forceful closing arguments to juries," State v. Papasavvas, 163 N.J. 565, 616, 751 A.2d 40 (2000) (quoting Frost, supra, 158 N.J. at 82, 727 A.2d 1), "[t]hey are duty-bound to confine their comments to facts revealed during the trial *16 and reasonable inferences to be drawn from that evidence." Frost, supra, 158 N.J. at 85, 727 A.2d 1; see also State v. Clausell, 121 N.J. 298, 342, 580 A.2d 221 (1990) (holding it was error for prosecutor to have asserted that defendants attempted to come "through the door and massacre the family" when the evidence established that the perpetrators had shot gun twice through the door, hitting the victim, and then ran away).
A prosecutor's summation that exceeds these bounds will only be grounds for reversal of the criminal conviction if "the prosecutor's misconduct was so egregious that it deprived the defendant of a fair trial." Frost, supra, 158 N.J. at 83, 727 A.2d 1 (citing State v. Ramseur, 106 N.J. 123, 322, 524 A.2d 188 (1987), cert. denied, 508 U.S. 947, 113 S.Ct. 2433, 124 L.Ed.2d 653 (1993)). "[T]he prosecutor's conduct must have been clearly and unmistakably improper, and must have substantially prejudiced defendant's fundamental right to have a jury fairly evaluate the merits of his defense." Papasavvas, supra, 163 N.J. at 616, 751 A.2d 40 (quoting State v. Timmendequas, 161 N.J. 515, 575, 737 A.2d 55 (1999), cert. denied, 534 U.S. 858, 122 S.Ct. 136, 151 L.Ed.2d 89 (2001)); see also State v. Feaster, 156 N.J. 1, 63-64, 716 A.2d 395 (1998), cert. denied, 532 U.S. 932, 121 S.Ct. 1380, 149 L.Ed.2d 306 (2001) (holding that prosecutor's comments, although inappropriate because not within the evidence adduced at trial, did not deprive defendant of a fair trial because "it was the weight of the evidence ... that led to this capital murder conviction rather than the prosecutor's improper comments during summation.").
To determine whether a prosecutor's misconduct was sufficiently egregious, we must consider "(1) whether defense counsel made timely and proper objections to the improper remarks; (2) whether the remarks were withdrawn promptly; and (3) whether the court ordered the remarks stricken from the record and instructed the jury to disregard them." Frost, supra, 158 N.J. at 83, 727 A.2d 1 (citing State v. Marshall, 123 N.J. 1, 153, 586 A.2d 85 (1991), cert. denied, 507 U.S. 929, 113 S.Ct. 1306, 122 L.Ed.2d 694 (1993)). If defendant does not object to the prosecutor's improper remarks, "the remarks will not be deemed prejudicial" as "[t]he failure to object suggests that defense counsel did not believe the remarks were prejudicial at the time they were made." Frost, supra, 158 N.J. at 83-84, 727 A.2d 1; see also Ramseur, supra, 106 N.J. at 323, 524 A.2d 188; State v. Bauman, 298 N.J.Super. 176, 207, 689 A.2d 173 (App.Div.), certif. denied, 150 N.J. 25, 695 A.2d 668 (1997).
Other factors to be considered include the frequency of the improper statements and whether the jury was instructed that statements made during summations are not evidence. See State v. Setzer, 268 N.J.Super. 553, 566, 634 A.2d 127 (App. Div.1993), certif. denied, 135 N.J. 468, 640 A.2d 850 (1994) (holding isolated improper statement that was followed by an instruction to the jury that statements by counsel are not evidence did not constitute reversible error); see also State v. Sheika, 337 N.J.Super. 228, 250, 766 A.2d 1151 (App. Div.) (holding that although prosecutor erred by suggesting in summation that the trial judge endorsed the testimony of the State's expert, there was no prejudice as it was a "brief and isolated incident" and the judge specifically told the jury that it was not bound by the witness' opinion testimony), certif. denied, 169 N.J. 609, 782 A.2d 427 (2001).
Just as a prosecutor cannot assert baseless accusations against a defendant, where a victim's character has no bearing *17 on the determination of defendant's guilt, a prosecutor "may not comment on the evidence in a manner that serves only to highlight the victim's virtues in order to inflame the jury." State v. Williams, 113 N.J. 393, 448-52, 550 A.2d 1172 (1988) (holding that statements made during opening and closing remarks at both the guilt and penalty phases of trial alleging that the victim had "so much to live for" and was "beautiful, educated, religious" and that defendant had "destroyed" all her goodness constituted reversible error); State v. Lockett, 249 N.J.Super. 428, 434-35, 592 A.2d 617 (App.Div.) (holding it was improper for prosecutor to have urged the jury to convict defendant out of sympathy for the victim), certif. denied, 127 N.J. 553, 606 A.2d 366 (1991).
Again, we caution prosecutors that they risk reversal and other sanctions by such conduct; nevertheless, we conclude that although the prosecutor's remarks were inappropriate, they were indeed "fleeting" and accompanied by an appropriate charge by the trial judge instructing, among other things, that counsel's comments are not evidence. We conclude that the remarks did not rise to the level of plain error.
We also conclude that the imposition of consecutive sentences for the murder and attempted murder was not an abuse of the judge's sentencing discretion. N.J.S.A. 2C:44-5. These were individual crimes with two separate victims. While the judge did not carefully articulate the standards enunciated in State v. Roach, 146 N.J. 208, 231, 680 A.2d 634, cert. denied, 519 U.S. 1021, 117 S.Ct. 540, 136 L.Ed.2d 424 (1996), and State v. Yarbough, 100 N.J. 627, 643-44, 498 A.2d 1239 (1985), cert. denied, 475 U.S. 1014, 106 S.Ct. 1193, 89 L.Ed.2d 308 (1986), we have where appropriate affirmed a consecutive sentence where the facts and circumstances leave little doubt as to the propriety of the sentence imposed. See State v. D'Amato, 218 N.J.Super. 595, 608, 528 A.2d 928 (App.Div.1987) (noting that "although the judge did not specifically address reasons for imposing a maximum sentence and consecutive sentence for the theft, we find no reason to disturb the sentences imposed," where the victim had also been killed and dismembered), certif. denied, 110 N.J. 170, 540 A.2d 169 (1988). In sum, we need not modify the sentence or remand for further reasons where there is no showing that the sentence is "clearly mistaken." State v. Kromphold, 162 N.J. 345, 355, 744 A.2d 640 (2000) (citing State v. Jarbath, 114 N.J. 394, 401, 555 A.2d 559 (1989)). There is no such showing here.
Finally, we conclude that defendant's argument as to merger is without merit and requires no further discussion. R. 2:11-3(e)(2).
Affirmed.
NOTES
[1] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).