# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0429-17T3

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

JAMES E. JOHNSON,

     Defendant-Appellant.

_____

Submitted June 6, 2019 – Decided July 5, 2019

Before Judges Whipple and Firko.

On appeal from the Superior Court of New Jersey, Law Division, Monmouth County, Indictment No. 15-01-0041.

Joseph E. Krakora, Public Defender, attorney for appellant (Molly O'Donnell Meng, Assistant Deputy Public Defender, of counsel and on the brief).

Christopher J. Gramiccioni, Monmouth County Prosecutor, attorney for respondent (Maura Kathryn Tully, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

Defendant James E. Johnson appeals from his June 1, 2017 conviction for first-degree aggravated sexual assault, N.J.S.A. 2C:14-2(a)(1) (count one); second-degree sexual assault, N.J.S.A. 2C:14-2(b) (count two); first-degree aggravated sexual assault, N.J.S.A. 2C:14-2(a)(2)(a) (count three); third-degree aggravated criminal sexual contact, N.J.S.A. 2C:14-3(a) (count four); second-degree endangering the welfare of a child, N.J.S.A. 2C:24-4(a) (count five); first degree aggravated sexual assault, N.J.S.A. 2C:14-2(a)(1) (count six); second-degree sexual assault, N.J.S.A. 2C:14-2(b) (count seven); first-degree aggravated sexual assault, N.J.S.A. 2C:14-2(a)(2)(c) (count eight); third-degree aggravated criminal sexual contact, N.J.S.A. 2C:14-3(a) (count nine); and second-degree endangering the welfare of a child, N.J.S.A. 2C:24-4(a) (count ten). We affirm the convictions and sentence but remand to the sentencing judge for clarification of the Sex Crimes Victim Treatment Fund (SCVTF) mandated fines.

I.

Defendant is the biological father of one victim, J.B., seventeen-years old at the time of trial, and the legal guardian of the other victim, C.B., then fourteen-years old. J.B. and C.B. are half-sisters, and they have the same

mother, D.B. Because D.B. abused drugs, the children were removed from her custody and care, but she remained in contact with them.

Both girls lived with their foster mother for several years. When J.B. was in the sixth grade, defendant began having supervised visitation with her which later changed to unsupervised visits that took place at his older daughter's house or at D.B.'s house.

In 2010, J.B. decided to live with defendant instead of being adopted by her foster mother. Defendant petitioned for custody of C.B. so that the sisters could live together with him. The court granted defendant's petition and he was appointed as C.B.'s legal guardian. The sisters and defendant went to live in his one bedroom apartment where D.B. also resided, and they all shared one bed. Once or twice, defendant kissed J.B. on her cheeks and lips, making her feel uncomfortable, but she did not complain about it to anyone. His miscreant behavior thereafter escalated. A few weeks after this episode, the children and defendant moved into his sister, L.H.'s house.

At L.H.'s house, the girls shared a room and defendant slept in the basement. From 2007, when J.B. was still in the sixth grade, up until 2013, defendant would wake her up while she was sleeping, order her to go to the basement with him, and remove her pajama pants and underwear. Defendant

3

would rub his penis outside of her vagina, penetrate her with his penis, and he forced her to perform fellatio, saying "suck it." He also penetrated J.B. anally. At trial, J.B. recounted these incidents, which occurred once or twice per week, and testified if she tried to refuse defendant, he "would just take my head and kind of put it down there or he would hit me until I would do it." J.B. testified that she never told C.B. about defendant's conduct because J.B. "didn't want [C.B.] to have to worry about anything." When C.B. entered the sixth grade, defendant started sexually assaulting her in the same way as he did with J.B., also in L.H.'s basement.

C.B. was sexually abused by defendant as well starting at age eleven. Because she was "in trouble" for coming home late, defendant ordered her to go down to the basement and stand in the corner as punishment. After a while, he told her to lay down on his bed, remove her clothing, and put her legs up. Defendant penetrated C.B.'s vagina with his finger and C.B. told him to get off of her and wanted an explanation as to why he was doing this to her. Defendant said she needed to learn a lesson for staying outside.

Over the course of time, defendant repeatedly molested C.B. and began penetrating her with his penis. In May 2012, C.B. asked her friend K.I. to help

C.B. run away after confiding in K.I. that defendant made her come down to the basement in a robe wearing nothing underneath, and to remove the robe.

K.I. reported C.B.'s disclosure to the police, who came to the house to speak with her. Fearing repercussions from defendant, C.B. denied the allegations. C.B. was also concerned about the Division of Youth and Family Services intervening and placing her back into foster care, which she did not want, nor did she wish to be separated from J.B. Social service caseworkers also came to the home to speak to C.B., but she refused to discuss the sexual abuse by her father because he was present, along with L.H. and her husband at the time.

Defendant's sexual abuse of both children continued, and they were unaware of the abuse suffered by the other. In 2013, defendant and the children moved into the America's Best Value Inn located in Monmouth County, where defendant and the children shared a room, and D.B. resided in a separate room at the Inn.

Defendant continued to sexually assault each of his daughters while the other one was asleep, engaging in intercourse, oral, and anal sex. C.B. testified that since J.B. was defendant's biological daughter, C.B. thought "he wouldn't do something like that to her." J.B. became pregnant because of defendant's

A-0429-17T3

sexual molestation. He drove her to Planned Parenthood to have an abortion, and directed her to lie to the doctors and tell them she had sex with someone at a party. J.B. complied with his request because she was scared defendant would further physically and sexually abuse her. Two weeks after undergoing the abortion, defendant began sexually assaulting J.B. again.

In February 2014, the family of four moved out of the Inn into a one bedroom apartment. Defendant continued to sexually abuse J.B. in the apartment in the middle of the night or when D.B. went to dialysis. Defendant would send J.B. text messages to come to him to have sex. If she did not answer his text messages, defendant would come into her room and get her. After having sex, J.B. cleaned the floor in the bedroom, washed the sheets, and her clothes to get rid of defendant's semen. J.B. was quiet during her sexual encounters with defendant so C.B. would not wake up and because J.B. was afraid of being beaten by him. The children were regularly punched by defendant with his fists or his open hand. He continued to sexually molest C.B. while J.B. was asleep.

One evening, D.B. caught defendant in the children's bedroom with his pants down and C.B. without pants or underwear on while she was asleep. D.B.

6

yelled at defendant to get out of the children's bedroom and she pulled up C.B.'s pants. Because D.B. had no "proof," she declined to call the police.

In August 2014, J.B. and C.B., together with their niece, K.J., decided to run away. J.B. left behind a note which read, "[c]an't deal with living life like this so we're going away for a while, not forever, but just until we feel we're happier. Don't bother looking for us. It's not like you care anyway." Defendant called the police and informed them he felt the girls went "school shopping in New York," but he failed to mention J.B.'s note. After spending the night at J.B.'s friend's house, defendant picked up the girls the next day and he called detective A.B. to advise her the girls were found but lied and said the girls were at the beach. The detective never saw J.B.'s note and proceeded to admonish the girls for running away. At trial, the detective testified she would have reacted differently if she knew about the note and she would have spoken to the girls because there was "something really wrong" going on.

Defendant told his older daughter, T.J., that the girls ran away to New York to hang out with J.B.'s boyfriend. Believing this to be true, T.J. started screaming at the girls for running away but after taking her daughter K.J. aside, T.J. became suspicious that defendant was physically and sexually abusing J.B.

and C.B. After disclosing their abuse to their older sister T.J., defendant was arrested and charged with multiple crimes.

Pending trial while incarcerated, defendant communicated to J.B. in a recorded telephone conversation that he was "sorry for everything" and that "I let 'ya down. I apologize for that." Defendant sent a letter to his sister which said "no one of this world is perfect. Remember only God can truly judge us," and that he had "been hurt by so many people in so many ways in my life that I thought it was normal to hurt people."

Defendant did not testify or present any witnesses. The jury found defendant guilty on all charges. The judge sentenced defendant to two twenty-year terms with an eighty-five percent parole ineligibility under the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2, for counts one through five as to J.B.; five-year periods of parole supervision on counts one and three; a seven-year term with an eighty-five percent parole ineligibility under NERA, and a three-year period of parole supervision on count two; and a four-year term of imprisonment on count four, into which count five merged. The sentences on counts one through four were to run concurrently with each other but consecutively to the sentences imposed on counts six through ten pertaining to C.B. Defendant was sentenced to two twenty-year terms of imprisonment with

an eighty-five percent parole ineligibility under NERA, for counts six through ten, and five-year periods of parole supervision for counts six and eight; a seven-year term of imprisonment with an eighty-five percent parole ineligibility under NERA, and a three-year period of parole supervision on count seven; and a four-year term of imprisonment on counts nine, into which count ten merged. The sentences on counts six through nine were to run concurrently. In the aggregate, defendant was sentenced to a forty-year term of imprisonment subject to NERA, and a ten-year period of parole supervision.

Defendant was also ordered to register under Megan's Law, N.J.S.A. 2C:7-2 to -11, parole supervision for life, N.J.S.A. 2C:43-6.4, and to have no contact with J.B. and C.B. The judge also imposed statutory fines and penalties, including a SCVTF penalty in the amount of $10,500.

Defendant presents the following issues for our consideration:

POINT I

THE PROSECUTOR ENGAGED IN MISCONDUCT REQUIRING REVERSAL OF DEFENDANT'S CONVICTIONS WHEN, IN OPENING AND SUMMATION, SHE MADE A NUMBER OF INFLAMMATORY AND HIGHLY EMOTIONAL APPEALS TO THE JURY. (Not Raised Below).

POINT II

A-0429-17T3

IN THE ALTERNATIVE, THE MATTER MUST BE REMANDED FOR RESENTENCING BECAUSE THE TRIAL COURT ERRED IN APPLYING AGGRAVATING FACTORS TWO AND SIX AND IN ASSESSING SEX CRIME VICTIM TREATMENT FUND PENALTIES WITHOUT MAKING THE REQUISITE FINDINGS. (Not Raised Below).

We have considered all of defendant's arguments in light of the record and the applicable legal principles and are satisfied that they lack merit, with the exception of the SCVTF penalty, which the State agrees requires a remand to the sentencing judge for clarification and requisite findings.

II.

In Point I, defendant argues that the prosecutor committed misconduct during the course of her opening and closing remarks to the jury by making inflammatory comments and repeatedly appealing to the jury's emotions regarding child sex abuse. Because defendant did not object at trial, we review the opening and closing statements for plain error and reverse only if such error was "clearly capable of producing an unjust result[.]" R. 2:10-2; State v. Walker, 203 N.J. 73, 89 (2010).

"A prosecutor's opening statement should provide an outline or roadmap of the State's case." State v. Torres, 328 N.J. Super. 77, 95 (App. Div. 2000). "The scope of the State's opening statement is limited to the 'facts [it] intends in

good faith to prove by competent evidence.'" State v. Wakefield, 190 N.J. 397, 442 (2007) (quoting State v. Hipplewith, 33 N.J. 300, 309 (1960)).

> "[T]he test for determining whether prosecutorial misconduct constitutes reversible error is whether the misconduct 'was so egregious that it deprived defendant of a fair trial.'" The goal that rule seeks to foster is that "juries [will] . . . reach a verdict and impose a penalty without inordinate exposure to unduly prejudicial, inflammatory commentary." Although we impose a greater burden on prosecuting attorneys than defense attorneys on that issue, "[i]t is well-established that prosecuting attorneys, within reasonable limitations, are afforded considerable leeway in making opening statements and summations."
>
> [State v. DiFrisco, 137 N.J. 434, 474 (1994) (alterations in original) (citation omitted) (first quoting State v. Pennington, 119 N.J. 547, 565 (1990); then quoting State v. Williams, 113 N.J. 393, 453 (1988); and then quoting Williams, 113 N.J. at 447).]

Defendant challenges the following comments made during the prosecutor's opening statement: "A father's greatest privilege and greatest responsibility is to protect his daughter, to be the man in her life that will never hurt her, but [defendant] didn't honor that duty. Instead, he abused their love, their respect, and ultimately their bodies."

The prosecutor is not to use the opening statement as a vehicle for anticipating what may be said in summation. See State v. Ernst, 32 N.J. 567, 577 (1960). After our careful review of the record, we conclude that the objected

11

to opening comments did not advance any factual representations that were unsupported by the evidence. See State v. Hipplewith, 33 N.J. at 309.

Defendant also challenges the following comments made during the prosecutor's closing statement:

> [Prosecutor]: [J.B.] told you that . . . she started getting awoken at night by kisses from her father. Now, these are not the types of good night kisses you may give to your children at night.
>
>     . . . .
>
> [J.B.] has to be walked out of the Planned Parenthood by a staff member and put in the car. Is that the loving father?
>
>     . . . .
>
> Not only is it bad enough that your father is having sex with you, you then need to get down on your hands and knees and clean his semen off of your carpet, but she does.
>
>     . . . .
>
> Successful, respect, love, pizza, dream, smile, ice cream, these are the happy words that [C.B.] called them that her and her sister wrote and had over the beds. This is a room of children . . . . This is what they are into. This is what they are about. LOL, pizza, and ice cream. Characters and drawings that [C.B.] does. This is what their room looks like. The room he pulls them out of at night to sexually assault them. The room of two young girls. This is where he would take them, down to that dirty dark basement [onto] his bed, in

12

> [Monmouth County] [onto] his bed, their own father's bed, the bathroom floor. Sometimes he had the courtesy enough to put a towel down for her.

More specifically, defendant contends that during summation, the prosecutor denigrated him, and expressed impermissible personal opinions about him because there was no physical evidence presented to the jury that either girl was sexually assaulted; and the other physical evidence presented was that defendant's semen was found in the bathroom in the house, "where it might be expected."

"A prosecutor must 'conscientiously and ethically undertak[e] the difficult task of maintaining the precarious balance between promoting justice and achieving a conviction,' ensuring that at all times his or her 'remarks and actions [are] consistent with his or her duty to ensure that justice is achieved.'" State v. Jackson, 211 N.J. 394, 408 (2012) (alterations in original) (quoting Williams, 113 N.J. at 447-48.)

"Notwithstanding the high standard to which a prosecutor is held as he or she gives an opening statement or summation, 'not every deviation from the legal prescriptions governing prosecutorial conduct' requires reversal." Id. at 408-09 (quoting Williams, 113 N.J. at 452). "Prosecutorial misconduct is a basis for reversal of a criminal conviction if the conduct was so egregious that it deprived

the defendant of the right to a fair trial." State v. Gorthy, 226 N.J. 516, 540 (2016) (quoting State v. Josephs, 174 N.J. 44, 124 (2002)).

In reviewing a claim of prosecutorial misconduct, we consider: "whether 'timely and proper objections' were raised[;] whether the offending remarks 'were withdrawn promptly[;]' and whether the trial court struck the remarks and provided appropriate instructions to the jury, . . . [and] whether the offending remarks were prompted by comments in the summation of defense counsel." State v. Smith, 212 N.J. 365, 403-04 (2012) (citation omitted) (quoting State v. Frost, 158 N.J. 76, 83 (1999)).

> Generally, if no objection was made to the improper remarks, the remarks will not be deemed prejudicial. Failure to make a timely objection indicates that defense counsel did not believe the remarks were prejudicial at the time they were made. Failure to object also deprives the court of the opportunity to take curative action.
>
> [State v. Timmendequas, 161 N.J. 515, 576 (1999) (citations omitted).]

Measured against these standards, we find no basis to reverse defendant's convictions based on the prosecutor's alleged improper closing statements.

Defendant relies on select statements he contends were impermissible or require a reversal, but fails to properly consider them in their context. The prosecutor made each statement as part of broader and permissible comments

14

relative to the uncontroverted evidence that defendant repeatedly, sexually assaulted the girls and nothing was untoward about referring to their young ages. Fair comments on the evidence were made by the prosecutor in her summation which did not "substantially prejudice[] defendant's fundamental right to have a jury fairly evaluate the merits of his defense." State v. Jang, 359 N.J. Super. 85, 95-96 (App. Div. 2003) (quoting State v. Papasavvas, 163 N.J. 565, 616 (2000)).

In sum, we conclude that the opening and closing comments made by the prosecutor were proper, and were not so egregious as to deprive defendant of a fair trial. See State v. Echols, 199 N.J. 344, 360 (2009); State v. Wakefield, 190 N.J. at 437. Because we do not find any of the comments meet this standard, we are satisfied defendant's argument that the cumulative effect of the comments requires reversal lacks any merit.

III.

Defendant argues that the matter must be remanded for sentencing because the judge erred in applying aggravating factor two, "[t]he gravity and seriousness of harm inflicted on the victim[;]" N.J.S.A. 2C:44-1(a)(2), based on the victims' ages, and in applying aggravating factor six, "extent of the defendant's prior criminal record and the seriousness of the offenses of which he has been convicted;" N.J.S.A. 2C:44-1(a)(6), based on a sixteen-year old

15

conviction. Defendant does not challenge the judge's finding that aggravating factor three, the "risk that the defendant will commit another offense;" N.J.S.A. 2C:44-1(a)(3), and aggravating factor nine, the "need for deterring the defendant and others from violating the law;" N.J.S.A. 2C:44-1(a)(9), were misapplied. The judge found, "there's not even remotely a mitigating factor in this case."

The standard of review is one of deference. Even if the appellate court would have reached a different result, it must affirm a sentence "as long as the trial court properly identifies and balances aggravating and mitigating factors that are supported by competent credible evidence in the record." State v. Lawless, 214 N.J. 594, 606 (2013).

To be accorded such deference, the sentencing court is required to "identify the relevant aggravating and mitigating factors, determine which factors are supported by a preponderance of evidence, balance the relevant factors, and explain how it arrives at the appropriate sentence." State v. O'Donnell, 117 N.J. 210, 215 (1989); State v. M.A., 402 N.J. Super. 353, 370 (App. Div. 2008); see also N.J.S.A. 2C:43-2(e); R. 3:21-4(g).

Defendant argues that the judge failed to make adequate findings to support the factors relied upon. Here, the judge made the following factual findings:

Aggravating factor number [one], [] I agree [], we have heinous acts, there is no question about that. The question I have is that I think the statute itself really contains the fact that we are dealing with a first[-]degree offense. And I think that I did apply aggravating factor number [one], that it could be considered double counting. So I'm not going to apply aggravating factor [one].

Aggravating factor [two] however, the gravity and seriousness of the harm inflicted on the victims, . . . including whether or not the defendant knew or reasonably should have known that the victims of the offense were particularly vulnerable. And here it was because of extreme youth and we're talking about under [thirteen] and then under [sixteen] years of age. Or was for any other reason[] substantially incapable of exercising normal physical or mental power of resistance.

And clearly when you're talking about someone in their [forties] and a [twelve][-]year[-]old or [thirteen][-]year[-]old or [fourteen][-]year old[], and we had testimony during the trial of . . . how he was really over these two girls as far as the way he would punish them at different times or scold them at different times.

And here again using his physical will to overbear them as young, very young children actually, clearly aggravating factor number [two] does apply in this case.

And the fact of what this has done to them over these years although as I said, they seem to be doing very well. But they've had to work at that I'm sure through many hours and hours and hours of counseling to get back their dignity and to move on with their lives, which they seem like very intelligent young ladies.

A-0429-17T3

But I do find that aggravating factor number [two] is here because that's not necessarily contained within the statute. This is overbearing based on mental . . . and physical overbearing of these two young children at the time.

Clearly there's a risk that the defendant will commit another offense. It was found by [Adult Diagnostic Treatment Center at] Avenel that it was repetitive conduct. That's not even a question. This went on for three or four years so it was repetitive in itself. And there's no doubt that it could be again if the right counseling is not received. So I do find aggravating factor [three].

Six, the extent of his prior criminal record. Although not extensive, there is a criminal conviction and the [c]ourt always finds [six] [if] there was a prior Superior Court conviction.

And [nine], clearly the need for deterring the defendant and others from violating the law. . . . so I do find aggravating factors [two], [three], [six], [and] [nine].

. . . .

So with that being said . . . the [c]ourt is clearly convinced that the aggravating factors substantially outweigh the mitigating factors, which there are none.

Defendant argues the judge improvidently found aggravating factor two and that the girls were vulnerable "because of extreme youth . . . under [thirteen] and then under [sixteen] years of age." We disagree that the judge double counted this factor by considering the girls' young ages because this is already

18

an element of aggravated sexual assault.  Here, the judge considered not only the ages of the girls, but the vast disparity in ages between them and defendant, leading the judge to aptly find defendant sexually assaulted his daughters to punish them and to "us[e] his physical will to overbear them."  This fact was duly considered as an aggravating factor.  See State v. Yarbough, 100 N.J. 627, 646 (1985).  As the judge aptly noted, these girls required "many hours and hours and hours of counseling to get back their dignity and to move on with their lives."

Defendant also argues that the judge abused his discretion in finding aggravating factor six based on defendant's one prior conviction for conspiracy to commit theft by deception sixteen years prior to his sentencing in this case. The record supports the judge's determination because defendant was convicted of the crime and was sentenced to Pre-Trial Intervention and terminated from same.  See State v. Cassady, 198 N.J. 165, 180-81 (2009) ("[A]n appellate court should not second-guess a trial court's finding of sufficient facts to support an aggravating or mitigating factor if that finding is supported by substantial evidence in the record.").  We further discern no basis to "second-guess" the court's weighing any of those aggravating factors.  See ibid. (quoting O'Donnell, 117 N.J. at 216).

19

Defendant contends the judge failed to apply mitigating factor seven, "[t]he defendant has no history of prior delinquency or criminal activity or has led a law-abiding life for a substantial period of time[.]" N.J.S.A. 2C:44-1(b)(7). We are satisfied that this argument lacks sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2).

Lastly, the State concedes that the judge failed to make the requisite findings pursuant to N.J.S.A. 2C:14-10(a), which imposes additional penalties for sex offenders. The statute provides in pertinent part:

> a. In addition to any fine, fee, assessment or penalty authorized under the provisions of Title 2C of the New Jersey Statutes, a person convicted of a sex offense, as defined in [N.J.S.A. 2C:7-2], shall be assessed a penalty for each such offense not to exceed:
>
> (1) [$2000], when the conviction is a crime of the first degree;
>
> (2) [$1000], when the conviction is a crime of the second degree;
>
> (3) $750, when the conviction is a crime of the third degree; and
>
> (4) $500, when the conviction is a crime of the fourth degree.
>
> [Ibid.]

The judge imposed a total of $10,500 in SCVTF penalties without complying with the mandate set forth by our Supreme Court in State v. Bolvito, 217 N.J. 221 (2014):

> In setting a SCVTF penalty, the sentencing court should consider the nature of the offense, as well as the defendant's ability to pay the penalty during any custodial sentence imposed and after his or her release. We further hold that the sentencing court should provide a statement of reasons as to the amount of any penalty imposed pursuant to N.J.S.A. 2C:14-10(a).
>
> [Id. at 224].

We remand the SCVTF penalty calculation to the sentencing judge for a determination to be made in accordance with Bolvito, and direct the judge to provide a statement of reasons as to the amount of any penalty imposed.

Defendant's convictions and sentence are affirmed, however, we vacate the SCVTF penalty and remand for further proceedings in accordance with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0429-17T3